# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| United States of America *ex rel.* | ) | |
| SOLOMON MONROE, | ) | |
| | ) | |
| Petitioner, | ) | Case No. 06 C 4334 |
| v. | ) | |
| | ) | |
| ROGER ZIMMERMAN, Warden, | ) | |
| | ) | Judge Joan B. Gottschall |
| | ) | |
| Respondent. | ) | |

## MEMORANDUM OPINION AND ORDER

Petitioner Solomon Monroe ("Monroe" or "petitioner") brings this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. For the reasons that follow, Monroe's petition is denied.

## I.    PROCEDURAL BACKGROUND

Following a jury trial in the Circuit Court of Cook County, Illinois, Monroe was convicted of first degree murder, after which the trial judge sentenced him to a term of 40 years' imprisonment. Monroe appealed and, on February 6, 2002, the Illinois Appellate Court affirmed Monroe's conviction and sentence. Monroe filed a petition for leave to appeal ("PLA") to the Illinois Supreme Court, which was denied on October 2, 2002. On November 6, 2002, Monroe filed a state post-conviction petition. This petition was dismissed on November 19, 2002, but Monroe was not given notice of the dismissal. On January 23, 2003, Monroe moved to amend his post-conviction petition. On February 10, 2003, the trial court dismissed the additional claims as frivolous. After Monroe filed an appeal, the appellate court affirmed the dismissal of the petition on December 17, 2004. Monroe then filed a PLA which was denied on December 1, 2005. On January 11, 2006, the

supreme court denied Monroe's motion for leave to file a petition to reconsider that denial.

On August 10, 2006, Monroe filed a *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, in which he alleges that: (1) his Fourth and Fifth Amendment rights were violated when he was arrested without probable cause; (2) his Fifth and Fourteenth Amendment rights were violated because the evidence was insufficient to convict him beyond a reasonable doubt based on a theory of accountability; (3) he was denied his Sixth Amendment right to a fair trial by the prosecutor's inflammatory, prejudicial and erroneous comments during closing arguments; and (4) he was denied the effective assistance of trial and appellate counsel because trial counsel failed to call witnesses to testify that (a) he requested an attorney when he was arrested and that (b) the police used brutality to enter Monroe's mother's house, and because appellate counsel failed to present these two ineffective assistance claims on direct appeal.

On September 19, 2006, Monroe informed this court that he had filed a second state post-conviction petition in state court. This court put the case in abeyance pending the resolution of that petition. On December 7, 2007, Monroe informed the court that his second state post-conviction petition was dismissed and that he did not file an appeal. On October 24, 2008, this court lifted the stay.

## II.    FACTUAL BACKGROUND[1]

### A.    Pre-Trial

In late 1996, Monroe was arrested and charged, along with Michael Thomas, Tyrone Curry

---

[1] The court takes its facts from the Illinois Appellate Court's recitation of facts in *People v. Monroe*, No. 1-99-4453 (Ill. App. Ct. Feb. 6, 2002). *Whitman v. Bartow*, 434 F.3d 968, 969 (7th Cir. 2006) (state court factual determinations are presumed correct and can only be rebutted with clear and convincing evidence).

and Tory Jackson, with two counts of first degree murder in connection with the November 23, 1996 stabbing death of Keith Stalker. Prior to trial, Monroe moved to quash his arrest and suppress evidence on the basis that the arresting police officers acted without sufficient probable cause. At a hearing, Chicago Police Detective Phillip Mannion testified that at about 5:30 a.m. on November 23, 1996, he was assigned to investigate Stalker's death. Mannion went to the crime scene in the vicinity of 4549 North Magnolia in Chicago and, upon canvassing the area, observed various blood stains about the street and adjoining walkway. Mannion further recovered a two-by-four wooden board.

Detective Mannion eventually went to Illinois Masonic Hospital, where he talked to James Bowling, a witness to the attack. Bowling told Mannion he had been with Stalker shortly before Stalker's death and they had consumed both cocaine and alcohol prior to the incident. Bowling told Mannion that Stalker had been attacked by four black males, one of whom went by the street name, "T-Bone." Bowling described each of the attackers and provided details of the incident, specifically relating that one of the attackers had used what Bowling believed to be a baseball bat. Bowling further indicated he had observed another attacker make a "stabbing" motion at Stalker. While he was under the assumption the latter attacker had a knife, Bowling never saw a weapon.

Following his conversation with Bowling, Mannion spoke with members of the hospital staff from whom he learned that Stalker had suffered knife wounds to the body as well as trauma to the head consistent with being hit by some type of blunt instrument.

In the late afternoon of November 25, 1996, Detective Dennis Gray interviewed Steven Myvett after Myvett was identified by Bowling as a witness to the crime. Myvett indicated he had been in the vicinity of 4549 Magnolia on November 23, 1996, and stated he had shared some

cocaine with Stalker that morning.

Gray learned from Myvett that at about 4 a.m., two white males in a red Chevy Blazer drove up to Stalker and Stalker sold them some phony cocaine. Shortly thereafter, Myvett and Stalker were approached by three members of the Black P-Stone Nation street gang and the gang members confronted Stalker about selling fake dope. Myvett identified the three individuals as "Red," "T-Bone," and "Titanic." When Stalker started to walk away, he was attacked. Myvett maintained he was instructed by "Red" to join in the beating and claimed he punched Stalker a couple times before walking away.

From their respective talks with Bowling and Myvett, detectives Gray and Mannion learned that "Red" was the street name used by Michael Thomas, "T-Bone" was the street name of Tyrone Curry, and "Titanic" was an individual named Tory Jackson. Jackson was arrested by police shortly after midnight on November 26, 1996, and brought to the police station for questioning. Jackson told Detective Gray that Thomas went by the street name of "Red," while Curry used the street name "T-Bone." Jackson also confirmed that his street name was "Titanic."

Jackson related to Detective Gray that at about 4 a.m. on November 23, 1996, he was selling drugs near the scene of Stalker's attack when two white males in a red Chevy Blazer drove up and asked for an eight ball of cocaine. Jackson retrieved the cocaine and handed it through the passenger side window to an individual who had a "GLN" tattoo on his forehead. Jackson explained that "GLN" was an abbreviation for the Gaylord Nation street gang. Once Jackson provided the drugs, the Blazer sped away. Jackson grabbed hold of the passenger side door as it drove down Magnolia and turned east on Wilson. Jackson eventually fell off the vehicle, and with the assistance of Myvett, who was in the area at the time, returned to Magnolia. Upon his return, Jackson was

summoned by Thomas to the back of a nearby building. Thomas was angry and punched Jackson in the face for allowing the cocaine to be stolen. When Jackson informed Thomas that the occupants of the Blazer belonged to the Gaylord Nation gang, Thomas retrieved a large hunting knife from his clothing. The two continued to talk until they heard a whistle-type sound from Curry, which Jackson recognized as a signal for other gang members to "show" themselves.

Jackson, along with Thomas, appeared from the back of the building and saw Curry and petitioner, a fellow gang member, standing with Stalker in the street. Curry abruptly punched Stalker, causing Stalker to fall to the ground. While Curry continued to punch Stalker, petitioner hit Stalker repeatedly with a wooden two-by-four board he had retrieved from an adjacent dumpster. Thomas suddenly ran over to the melee, displayed the knife, and stabbed Stalker in the stomach. After Thomas dislodged the knife from Stalker's abdomen, the three attackers and Jackson retreated to petitioner's car and drove to the apartment of Thomas's girlfriend near 53rd and Aberdeen on Chicago's south side.

Jackson told Detective Gray where petitioner, Thomas and Curry could be located. Gray relayed this information to Detective Mannion, who, along with his partner, went to petitioner's residence. Petitioner was brought to the station a short time later and ultimately provided an inculpatory statement to the authorities.

Upon consideration of the evidence, the trial court concluded the officers had sufficient probable cause to effect a warrantless arrest of petitioner.

**B.     Evidence at Trial**

The State's evidence established that in the early morning hours of November 23, 1996, Tory Jackson was selling cocaine along with Michael Thomas, Tyrone Curry, petitioner and Keith Stalker

in the 4500 block of North Magnolia on Chicago's north side. Jackson, Thomas, Curry and petitioner were each members of the Black P-Stone Nation street gang, while Stalker was affiliated with a different gang known as Gaylord Nation.

As to each individual's role in the drug selling, Jackson received the cocaine from Thomas and was responsible for selling it to customers. Stalker assisted Jackson in fielding customers, while petitioner watched the cocaine and supplied Jackson with packets as needed. Thomas, who was described as the third ranking member of the gang, and Curry acted as security, keeping a lookout for police and ensuring the cocaine was secure.

Jackson recited the events involving the proposed transaction with the two Gaylord Nation gang members in the red Blazer. Jackson explained that after falling off the vehicle and being assisted by Myvett back to Magnolia, he was confronted by Thomas. Thomas, who Jackson described as angry over the loss of the drugs, told Jackson he was "fucking up" and punched Jackson in the face.

Upon hearing the gang's signal to appear, Jackson, along with Thomas, walked onto Magnolia where Jackson observed Curry and petitioner walking with Stalker on an adjacent sidewalk. Stalker was positioned directly between Curry and petitioner. Curry, petitioner and Stalker continued to walk until they reached a nearby dumpster. Without any provocation from Stalker, petitioner suddenly struck Stalker in the face, causing Stalker to fall to the ground. Petitioner, now joined by Curry, repeatedly punched Stalker. While Curry continued to beat Stalker, petitioner ran to the dumpster and retrieved a wooden two-by-four board, which petitioner then used to strike Stalker twice. Curry also used the wooden board to beat Stalker. Jackson estimated that Curry and petitioner collectively hit Stalker with the board about seven times. Per the parties'

stipulation, a wooden two-by-four board, containing human blood, was recovered by the authorities near the scene of Stalker's attack.

When Thomas approached, Curry and petitioner ceased hitting Stalker and stood up. Petitioner, as well as Curry, did not walk away but stayed at the scene. Thomas then pulled out the knife and stabbed Stalker in the stomach.

After Thomas dislodged the knife, Thomas, Curry, petitioner and Jackson fled the scene in petitioner's car. The group drove to a south side apartment belonging to friends of Thomas in the area of 53rd and Aberdeen where they stayed overnight. Thomas, Curry and petitioner went inside the apartment, while Jackson remained in the car to sleep. At some later point, petitioner returned to the car and also slept.

Stalker, meanwhile, was transported to Illinois Masonic Hospital where he later died. The testimony of the medical examiner who performed an autopsy revealed gaping lacerations to the upper back portion of Stalker's head and to the right thigh; abrasions on the left side of the head, above the eyebrow, and on the forehead; contusions to the left and right cheek regions of the face, and to the upper and lower lip; and a jagged edged incised wound, measuring nine inches, to the upper abdomen. The examiner further noted internal hemorrhaging in several areas, including in the left temporal area of the skull, and also observed cerebral swelling in the brain.

In his professional opinion, the medical examiner concluded that Stalker died as a result of the stab wound sustained to the upper abdomen. The examiner further opined that the blunt trauma to Stalker's head was a significant contributing factor in his death.

After his arrest, petitioner was interviewed by Detective Gray. Gray advised petitioner of his constitutional rights and petitioner agreed to talk. According to Gray, petitioner acknowledged

selling cocaine with Jackson, Thomas and Curry in the area of Wilson and Magnolia during the early morning hours of November 23, 1996. Petitioner explained how the two individuals in the red Blazer stole the drugs and how he and his fellow gang members physically confronted Stalker about his role in the situation. Petitioner specifically related that Curry punched Stalker repeatedly while he struck Stalker with a wooden two-by-four board. Thomas suddenly emerged, displaying a large knife, and stabbed Stalker in the stomach. Detective Gray testified that at no time during their discussion did petitioner ever indicate that he walked away from the scene of Stalker's beating when Thomas appeared. After the stabbing, Thomas, Curry, petitioner and Jackson fled to a south side residence.

Petitioner repeated the details of his involvement in Stalker's attack to Assistant State's Attorney Karen O'Malley and, after being advised of his constitutional rights, agreed to give a written statement. The written statement, which was prepared by O'Malley and signed by petitioner, detailed petitioner's beating of Stalker with the wooden board and specifically provided that after petitioner and Curry had finished their attack, Thomas ran to the scene and stabbed Stalker in the stomach. According to O'Malley, petitioner's portrayal of this part of the incident differed from statements he had given to her earlier. O'Malley explained petitioner had originally stated that Thomas had appeared on the scene as petitioner and Curry were still beating Stalker. Petitioner, however, changed his account of events while O'Malley was formalizing the statement, telling O'Malley that he and Curry had completed their attack when Thomas approached.

O'Malley testified that petitioner was allowed to read the statement and that petitioner made, and initialed, various changes to the statement's content. The written statement specifically states that petitioner was treated well by the police, that no threats or promises were given in exchange for

his cooperation, and that his statement was freely and voluntarily given. Detective Gray similarly testified that petitioner was treated civilly and at no time was physically assaulted or coerced into providing a statement.

After the State rested, petitioner took the witness stand and acknowledged that he and Curry confronted Stalker over the loss of drugs but only after Stalker struck him with a wooden board. According to petitioner, Stalker, after disclaiming any involvement with the theft of the drugs, picked up a wooden two-by-four board, which was laying nearby, and swung it at petitioner's head. Instinctively shielding his head, petitioner claimed he was hit in the hand. Petitioner maintained he never threatened Stalker or otherwise provoked Stalker into swinging the board.

In response to petitioner being hit, Curry punched Stalker, causing Stalker to lose hold of the board and to fall to the ground. Curry continued to punch Stalker while petitioner picked up the board that had been used by Stalker. Because he was mad at being struck in the hand, petitioner hit Stalker twice in the legs. Petitioner maintained he limited his attack to Stalker's legs and never struck Stalker on any other part of his body.

After the second hit, Curry grabbed the board from petitioner's possession and began striking Stalker. Petitioner claimed he then started to walk away from the scene toward his car. Petitioner was eventually joined by Curry and the two proceeded to petitioner's car. Suddenly, Thomas appeared from the gangway of two buildings and ran toward Stalker.

Petitioner estimated he and Curry were about a half a block or more away from Stalker when Thomas appeared. Petitioner watched Thomas as he ran at Stalker, pulled a knife from his clothing and stabbed Stalker in the stomach. Petitioner claimed the formal statement prepared by ASA O'Malley was the product of physical abuse and coercion by the investigating officers and

specifically attacked that portion of the statement that describes the point of Thomas's involvement as being inaccurate.

After dislodging the knife, Thomas joined up with petitioner, Curry and Jackson, and the group drove in petitioner's car to a south side apartment. Petitioner stated that upon arriving at the apartment, Thomas and Curry went inside, while he and Jackson slept in the car. When they awoke later in the day, petitioner and Jackson joined Thomas and Curry in the apartment. According to petitioner, "we [were] there [at the apartment] for like a day or two," after which petitioner left and went home.

Petitioner asserted he was completely unaware that Thomas had a knife in his possession on the morning of the attack and, thus, stated he had no knowledge of any intention on the part of Thomas to stab Stalker. Petitioner additionally maintained that he never discussed any plan with Thomas to stab or otherwise harm Stalker.

Following jury deliberations, petitioner was convicted of murder under an accountability theory and sentenced to a term of 40 years' imprisonment.

## III.    ANALYSIS

### A.    Standard of Review

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a habeas petitioner is not entitled to a writ of habeas corpus unless the challenged state court decision is either "contrary to" or "an unreasonable application of" clearly established federal law as determined by the United States Supreme Court. 28 U.S.C. § 2254(d)(1); *see also Williams v. Taylor*, 529 U.S. 362, 367 (2000). A state court's decision is "contrary to" clearly established Supreme Court law "if the state court arrives at a conclusion opposite to that reached by the Court on a question of law" or

"if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to ours." *Williams*, 529 U.S. at 404. To demonstrate an "unreasonable application" of clearly established federal law, a habeas petitioner must establish that the state court unreasonably applied the controlling legal rule to the facts of the case. *Id.* at 407. The state court's application of Supreme Court precedent must be more than incorrect or erroneous. Rather, it must be "objectively unreasonable." *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003); *Hardaway v. Young*, 302 F.3d 757, 762 (7th Cir. 2002) (state court decision must lie "well outside the boundaries of permissible differences of opinion").

Before a federal court will consider a habeas corpus petition, a petitioner must satisfy several requirements, including the exhaustion of state remedies and the avoidance of procedural default. Procedural default refers primarily to two situations. The first occurs when the petitioner presents federal claims in his habeas petition that he did not fairly present to the state courts, thereby depriving the state courts of the first opportunity to address the claims. *O'Sullivan v. Boerckel*, 526 U.S. 838, 844-45 (1999). A petitioner's failure to fairly present each habeas claim to the state's appellate and supreme courts in the time and manner required leads to a default of the claim, thus barring the federal court from reviewing the claim's merits. *Id*. at 848. The second type of procedural default occurs where the state court bases its judgment on a finding of procedural default or waiver under state law, and such grounds are "independent of the federal question and adequate to support the judgment." *Franklin v. Gilmore*, 188 F.3d 877, 881 (7th Cir. 1999). A federal court, however, may excuse a procedural default if a petitioner can show either cause for the default and actual prejudice as a result of the alleged violation of federal law, or can demonstrate that failure to consider the claim will result in a fundamental miscarriage of justice. *Coleman v. Thompson*, 501

U.S. 722, 750 (1991).

## B.    Procedural Default

Respondent argues that Claim III is procedurally defaulted.  In this claim, petitioner asserts that he was denied a fair trial by the prosecutor's allegedly improper and inflammatory comments during closing argument, during which the prosecutor allegedly misstated the evidence and placed the prosecutor's integrity at issue.  Petitioner presented these allegations to the Illinois Appellate Court on direct appeal.  The state appellate court held that, under Illinois law, petitioner had forfeited these allegations because he failed to object to the prosecutor's comments at trial, and failed to identify them with the requisite specificity in his post-trial motion.

A federal court will not review a question of federal law decided by a state court if that decision rests on state law grounds that are independent of the federal question and adequate to support the judgment.  *United States ex rel. Bell v. Pierson*, 267 F.3d 544, 556 (7th Cir. 2001).  A state law ground that provides the basis for a state court decision is independent when the court actually relied on the procedural bar as an independent basis for its disposition of the case.  *Id.* (citing *Harris v. Reed*, 489 U.S. 255, 261 (1989)).  A state law ground is adequate when it is a firmly established and regularly followed state practice at the time it is applied.  *Id*.

Here, the state law ground for dismissal was "independent" because the state appellate court concluded that dismissal was proper because Monroe forfeited these allegations by failing to object at trial and failing to identify them with specificity in his post-trial motion, and "adequate" because the forfeiture rule is well-established in Illinois.  *Miranda v. Leibach*, 394 F.3d 984, 992 (7th Cir. 2005) (Illinois rule requiring contemporaneous objection and post-trial motion is an independent and adequate ground upon which to find default in federal habeas review).  The fact that the appellate

court went on to review the claim on the merits in an alternate holding does not alter the procedural bar. Such a dual holding can be an independent and adequate state ground so long as the state court clearly and expressly relied upon the state ground as one basis for its decision. *Lee v. Davis*, 328 F.3d 896, 900 (7th Cir. 2003) ("Even when both the merits of a claim and a state procedural bar are discussed together, the state procedural grounds will be determinative if they are clearly presented and they constitute an adequate independent ground … .").

A federal court, however, may excuse a procedural default if a petitioner can show either cause for the default and actual prejudice as a result of the alleged violation of federal law, or can demonstrate that failure to consider the claim will result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 750. Because petitioner makes no attempt to argue that any exception to the procedural default bar exists, the court cannot review this claim.

### C. Merits

#### 1. Claim I

In his first claim, petitioner argues that his statements to the police should have been suppressed because he was arrested without probable cause. In *Stone v. Powell*, 428 U.S. 465, 494 (1976), the Supreme Court established a general rule that criminal defendants may not seek collateral review of Fourth Amendment exclusionary rule claims under § 2254 if they received "an opportunity for full and fair litigation of" their Fourth Amendment claims in state court. The Seventh Circuit has held that such an opportunity has been provided when: (1) the petitioner has "'clearly informed the state court of the factual basis for that claim and has argued that those facts constitute a violation of his fourth amendment rights, and (2) the state court has carefully and thoroughly analyzed the facts and (3) applied the proper constitutional case law to the facts.'"

*Hampton v. Wyant*, 296 F.3d 560, 563 (7th Cir. 2003) (quoting *Pierson v. O'Leary*, 959 F.3d 1385, 1391 (7th Cir. 1992)).

Petitioner raised this claim in a pretrial motion to quash his arrest and suppress evidence, and the state trial court denied that motion after an evidentiary hearing. The trial judge determined that the police had probable cause to effect a warrantless arrest. In addition, petitioner also raised the issue on direct appeal. On appeal, the state appellate court agreed that the officers had probable cause and affirmed the trial court's denial of the motion.

Based on the above, the state courts provided a mechanism for petitioner to present his claim. Petitioner has not argued that the state court applied the wrong constitutional case law to the facts or that the state court procedures were in any way a "sham." *See Cabrera v. Hinsley*, 324 F.3d 527, 531 (7th Cir. 2003) (noting that a "sham" could exist "if the judge had his mind closed to the necessity of a hearing, or was bribed, or decided . . . that probable cause is not required in Illinois, or was sleep walking . . . or in some other obvious way subverted the hearing."). Because the state courts afforded petitioner a full and fair opportunity to litigate his Fourth Amendment claim, the court may not consider this claim.

## 2. Claim II

In his second claim, petitioner argues that he was not proven guilty beyond a reasonable doubt of murder based on accountability. Petitioner presented this claim to the state appellate and supreme courts on direct appeal. Citing *People v. Brown*, 661 N.E.2d 287, 296 (Ill. 1996), the state appellate court first set forth that "the relevant inquiry in considering a challenge to the sufficiency of the evidence is whether, after viewing the evidence in a light most favorable to the State, any rational trier of fact could have found the essential elements of the crime established beyond a

reasonable doubt." *People v. Monroe*, No. 1-99-4453, at 18 (Ill. App. Ct. Feb. 6, 2002). Although

the state appellate court did not cite to any federal cases, it utilized the appropriate constitutional

standard outlined in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

The appellate court then laid out the law in Illinois on accountability. The state appellate

court stated that:

> In Illinois, a person is legally accountable for the acts of another when "[e]ither
> before or during the commission of an offense, and with the intent to promote or
> facilitate such commission, he solicits, aides, abets, agrees or attempts to aid such
> other person in the planning or commission of an offense." A defendant's presence
> at the scene of the crime coupled with his knowledge that a crime is being
> committed, without more, is insufficient to establish accountability. Nevertheless,
> active participation in the offense is not a required element for establishing liability.
> As explained by [the Illinois] supreme court, the intent of the perpetrator to aid in the
> commission of an offense is the cornerstone of accountability.

*People v. Monroe*, No. 1-99-4453, at 18-19 (Ill. App. Ct. Feb. 6, 2002) (citations omitted). The state

appellate court continued:

> The intent to promote or facilitate a crime may be shown either by evidence that the
> defendant shared the criminal intent of the principal or by evidence of a common
> criminal plan or design. The "common design" rule, which is specifically
> incorporated into accountability jurisprudence, provides that where two or more
> persons engage in a common criminal design or agreement, any acts in furtherance
> of that common design committed by one party are considered to be the acts of all
> parties to the design or agreement and all are equally responsible for the
> consequences of the further acts.
>
> Liability will attach even if the defendant's intended participation in the common
> design is to aid the principal in only one offense and not to aid the principal in other
> crimes committed by the principal in furtherance of the planned or intended act.
> "When the evidence shows that a defendant 'planned and intended to commit <u>some</u>
> offense . . . it is sufficient to hold him accountable' for murder which results from the
> concerted acts toward that offense." So, a defendant may be found guilty under an
> accountability theory where he enters into a common design to commit only battery,
> yet a murder is committed during the course of that offense.

*Id*. at 19-21 (citations omitted) (emphasis in original).

With respect to a common design, the appellate court explained:

A common design may be inferred from the surrounding circumstances, including the character of the defendant's conduct before and after the offense. Factors helpful in this analysis include the defendant's presence at the scene of the crime without dissociation, his flight from the crime scene with the other perpetrators, continued association with the perpetrators after the criminal act, and failure to report the incident to authorities.

*Id*. at 22.

With these principals of accountability in mind, the court cannot conclude that the appellate court's holding that petitioner was proven guilty beyond a reasonable doubt was objectively unreasonable. There was much evidence to support petitioner's conviction, especially keeping in mind that a defendant may be guilty of murder under an accountability theory "where he enters into a common design to commit only a battery, yet a murder is committed during the course of that offense." *Id.* at 21. The jury heard evidence that petitioner, Curry and Thomas were members of the same gang and believed that Stalker had conspired with members of his gang to steal drugs from them. The jury also heard testimony that petitioner and Curry began hitting Stalker without provocation and that both later beat him with a two-by-four wooden board. There was testimony that Curry signaled Thomas by whistling and that petitioner and Curry both remained on the scene when Thomas ran up, pulled a knife and stabbed Stalker. Petitioner fled from the crime, in his car, with Thomas, Curry and Jackson, and remained with them, at a minimum, until the next day. Petitioner never reported the incident to authorities. Based on this evidence, a reasonable juror could have found a "common plan" between the men, and, under Illinois law, could have found petitioner guilty of murder under an accountability theory. Because the state appellate court's reasoning was not objectively unreasonable, petitioner is not entitled to relief based on this claim.

### 3. Claim IV

In his final claim, petitioner argues that his trial counsel was ineffective for failing to call his brother and sister-in-law to testify that: (1) the police threatened to kill the family dog after they pushed their way into petitioner's mother's house, and (2) that petitioner asked to call an attorney when he was detained. Petitioner asserted that his sister-in-law, Isabell Estavia, and his brother, Chris Estavia, would have testified that the police threatened to kill the family dog when they came to arrest him. Further, Isabell would have testified that petitioner told the police officers that he wanted to call his attorney. Petitioner argues that, had these witnesses testified, the judge at the hearing on the motion to suppress his statement to police, and the jury at trial, would have been more likely to believe his claims that he requested an attorney and that the police punched him in the stomach before he gave his inculpatory statement at the police station.

Petitioner presented this issue to the state appellate and supreme courts on appeal from his state postconviction petition. Relying on the standard set out in *Strickland v. Washington*, 466 U.S. 668 (1984), the appellate court first dealt with petitioner's argument that the witnesses should have been called to testify at the hearing on the motion to suppress petitioner's statement to police. The appellate court noted that the statements contained in the proffered affidavits were contradicted by the record:

> Several of the Estavias' statements with respect to the actions of police the night of the arrest conflict with facts presented to the trial court by defense counsel at the pretrial hearings. Isabell Estavia's affidavit stated that police "pushed and rushed in the house" and came through the front door and Chris Estavia's affidavit stated that police forced their way into their home and forced their way up the stairs. These statements are contradicted by the parties' stipulation at the hearing on defendant's motion to quash arrest that the detectives remained in the vestibule while a family member called defendant, who was on the second floor of the house. Moreover, the Estavias' allegations that police acted in a harassing manner and threatened to kill their dog conflicts with defense counsel's argument in support of the motion to quash

> that police used "trickery" to get defendant to the police station in that "[t]hey told him there was one thing going on and there was something else."

*State v. Monroe*, 1-03-1110, at 7-8 (Ill. App. Ct. Dec. 17, 2004). Thus, the appellate court concluded that it was reasonable to infer that counsel's decision not to call Isabell and Chris was a tactical decision. Their testimony would have weakened the version of events put forward by petitioner's counsel.

The appellate court also held that petitioner had not shown a reasonable probability that the outcome of the suppression hearing would have been different had the two witnesses been called. Specifically, the court noted that "in light of the conflict between the witnesses' affidavits and defendant's previously presented facts,[2] defendant has not shown that there was a reasonable probability that their testimony would have led the court to resolve the credibility question in favor of defendant to establish the prejudice prong of the *Strickland* test." *Id.* at 8-9.

In addition to arguing that counsel was ineffective for failing to call the two witnesses at the suppression hearing, petitioner also argued that his counsel was ineffective in failing to call the Estavias to testify at trial. He argued that the jury may have been more likely to believe petitioner's

---

[2] "[P]reviously presented facts" references the earlier hearing the court held on the motion to quash petitioner's arrest. At the motion to quash hearing, Monroe's attorney offered, by stipulation, the testimony of Monroe's mother, that she responded to a knock at the door in the early morning of November 26, whereupon police informed her that they wanted to speak to Monroe. Monroe also entered into a stipulation with the state that detectives knocked on Monroe's door and asked if Monroe was there. They remained in the vestibule while a family member called Monroe. Monroe was asked to accompany the detectives to the police station. Monroe left the house with them. The State argued Monroe voluntarily accompanied police to the police station whereupon the police had probable cause to arrest based on a witness who named Monroe as being involved in the beating. Monroe argued that the police used trickery to get him to go to the police station. He argued police "told him there was one thing going on and then there was something else." The trial judge found that Monroe voluntarily accompanied police to the station and that, once at the station, the police had probable cause to arrest him.

testimony that he asked for an attorney and that officers punched him prior to his giving his statement if they had heard from Isabell that petitioner asked for an attorney at the time of his arrest and from both witnesses that the police acted in a harassing manner and threatened to kill their dog. Once again, the appellate court concluded that counsel's decision not to call the witnesses was the result of a reasonable trial strategy because counsel likely concluded that the witnesses' credibility would be questioned given that they were family members. The court also noted that petitioner did not testify at trial to police misconduct during his arrest, but rather later at the station. The court concluded that "in light of the overwhelming evidence of defendant's guilt presented at trial, including defendant's written statement which factually corroborated the testimony of the State's eyewitness Tory Jackson, defendant has not shown that there is a reasonable probability that the outcome of the trial would have been altered by the introduction of the witnesses' allegations concerning the circumstances of defendant's arrest." *Id*. at 9-10.

In order for petitioner to prevail on this claim, the appellate court's application of *Strickland v. Washington*, 466 U.S. 668 (1984) must have been objectively unreasonable. Under *Strickland*, petitioner must show that his counsel's performance fell below an objective standard of competence and that there is a reasonably probability that, but for counsel's error, the result of the trial would have been different. 466 U.S. at 690-695. Petitioner "must do more than show that he would have satisfied *Strickland*'s test if his claim were being analyzed in the first instance, because under § 2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied *Strickland* incorrectly. Rather, he must show that the [Illinois Appellate Court] applied *Strickland* to his case in an objectively unreasonable manner." *Bell v. Cone*, 535 U.S. 685, 698-699 (2002) (internal citations omitted).

When a court reviews an ineffective assistance of counsel claim, the court's review is "highly deferential" to the attorney, "with the underlying assumption that 'counsel's conduct falls within the wide range of reasonable professional assistance.'" *United States v. Holman*, 314 F.3d 837, 840 (7th Cir. 2002) (quoting *Strickland*, 466 U.S. at 689). Acts or omissions of an attorney that may be classified as trial tactics cannot be considered by a court in evaluating an ineffective assistance of counsel claim. *See United States v. Williams*, 106 F.3d 1362, 1367 (7th Cir. 1997). "Usually, counsel's decision not to call a witness is a tactical decision" not subject to review by a reviewing court in deciding an ineffective assistance claim. *Barnhill v. Flannigan*, 42 F.3d 1074, 1078 (7th Cir. 1994). In the context of counsel's failure to call a certain witness, the Seventh Circuit has stated,

> This court has frequently considered whether and under what circumstances counsel's failure to call . . . witnesses to testify amounts to ineffective assistance of counsel. *See, e.g., United States v. Olson*, 846 F.2d 1103 (7th Cir. 1988); *Sullivan v. Fairman*, 819 F.2d 1382 (7th Cir. 1987). These decisions recognize that once defense counsel conducts a reasonable investigation into all lines of possible defenses, counsel's strategic choice to pursue one line to the exclusion of others is rarely second-guessed on appeal. An appellate court will review an ineffective assistance of counsel ground only if counsel's conduct or decision was not made "in the exercise of reasonably professional judgment." *Strickland*, 466 U.S. at 690. *See also United States ex rel. Robinson v. Pate*, 312 F.2d 161, 162 (7th Cir. 1963) (counsel not ineffective because strategic choice was one about which competent attorneys might honestly disagree). The appellate court will make "every effort to eliminate the distorting effects of hindsight" and must apply a "heavy measure of deference to counsel's judgment."

*United States v. Balzano*, 916 F.2d 1273, 1294 (7th Cir. 1990).

Keeping in mind these legal principals, the court cannot conclude that the appellate court's holdings were "objectively unreasonable." In light of petitioner's *pro se* status, the court has reviewed the petition, as well as the arguments raised by petitioner before the state courts, in detail. Turning first to the suppression hearing and the appellate court's reliance on trial strategy, the court

must recognize that the Seventh Circuit has made clear that "when an attorney in the course of a trial makes '[s]trategic choices after thorough investigation [they] are virtually unchallengeable." *Id.* (quoting *Sullivan v. Fairman*, 819 F.2d 1382, 1388-93 (7th Cir. 1987)).  Here, the state appellate court concluded that the introduction of testimony by Isabell and Chris Estavia would have directly contradicted and thus weakened counsel's strategy (that Monroe only requested an attorney at the police station and that the police used "trickery" rather than brutality when they arrested him), and this court cannot conclude that such a conclusion was "well outside the boundaries of permissible differences of opinion," *Hardaway*, 302 F.3d at 762.  Nor can the court conclude that the state court's finding of a lack of prejudice was objectively unreasonable.  The appellate court found that due to the conflicts between the witnesses' version of events and the version already presented as part of the motion to quash, there was not a reasonable probability that the trial judge would have resolved the credibility dispute in favor of petitioner.  Because this conclusion is not "well outside the boundaries of permissible differences of opinion," *Hardaway*, 302 F.3d at 762, it is not "objectively unreasonable" and the claim fails.

Likewise, with respect to petitioner's claim that the Estavias should have been called to testify at trial, the court cannot conclude that the appellate court's ruling was objectively unreasonable.  Specifically noting that the Estavias were petitioner's family members (whose credibility would necessarily be questioned) and the fact that petitioner himself did not testify to any police misconduct while he was detained at his house, the appellate court concluded that counsel's decision not to call the Estavias was the result of trial strategy.  In addition, the court found that petitioner was not prejudiced by counsel's failure to call the witnesses in light of the overwhelming evidence of petitioner's guilt presented at trial, including petitioner's written statement and the

testimony of the State's eyewitness, Tory Jackson. In light of the deference due to a trial attorney's strategy and the weight of the evidence against petitioner, the court cannot conclude that the appellate court's ruling was objectively unreasonable.

Lastly, petitioner claims his appellate counsel was ineffective for failing to argue that his trial counsel was ineffective for failing to call the Estavias as witnesses. Because petitioner's trial counsel was not ineffective, petitioner's appellate counsel was not ineffective for failing to raise a meritless claim.

## IV.    CONCLUSION

For all the foregoing reasons, Solomon Monroe's petition for a writ of habeas corpus is denied.

ENTER:


_____/s/_____
JOAN B. GOTTSCHALL
United States District Judge

DATED:   August 18, 2010